PITTMAN, Judge.
J.B.B. (“the mother”) and J.W.B. (“the father”) separately appeal from judgments terminating their parental rights to their two sons: J.B., who was born on February 4, 2000; and T.B., who was born on July 19, 2002. This court consolidated the appeals, and we now affirm the judgments in both cases.

Facts and Procedural History

The parents married in 2003, after the births of J.B. and T.B., but the father was listed on each child’s birth certificate and has acknowledged that the children are his. The mother has another biological son, Z.B., by a prior relationship. Z.B., who is four years older than J.B., was adopted by the maternal grandparents when he was a baby. Although Z.B. lived with the maternal grandparents, he often visited in the home of the mother and his two half brothers.
*520 In July 2006, social workers from the Jefferson County Department of Human Resources (“DHR”) removed J.B. and T.B. from the parents’ home following reports of domestic violence between the parents.[1] In September 2006, the Jefferson Juvenile Court determined that J.B. and T.B. were dependent and awarded their custody to DHR. The children were placed in foster care, and the parents were allowed visitation supervised by DHR. During the first year following the removal of the children from their custody, the parents completed courses on parenting skills, domestic violence, and anger management; they also underwent drug assessments and psychological evaluations, and they participated in individual and couples’ counseling.
The father’s psychological evaluation revealed that he has a full-scale I.Q. of 78. In elementary school, he had been diagnosed with a learning disability as well as attention-deficit/hyperactivity disorder (“ADHD”) and obsessive-compulsive disorder. His adult diagnoses are that he abuses alcohol, that he suffers from major depression, and that he has a generalized anxiety disorder, an impulse disorder not otherwise specified, and an antisocial-personality disorder with narcissistic personality traits and paranoid personality features. He has received Supplemental Security Income benefits for a learning disability since he was in the fifth grade; at the time of trial he was 32 years old.
The mother’s psychological evaluation disclosed that she has a full-scale I.Q. of 82, that she suffers from dysthymic disorder (chronic depression, but with less severity than major depression), and that she has a personality disorder not otherwise specified, with borderline and avoi-dant features. At the time of trial, she was 35 years old.
During the first year following their removal from the parents’ custody, J.B. and T.B. lived in three different foster homes. Each change of residence was precipitated by an allegation of foster-parent abuse of the children. Both boys suffered from enuresis (the inability to control the passage of urine) and encopresis (the inability to control the passage of stool). J.B. is aggressive and T.B. is more docile. During the children’s third placement, Rowan-na Woods, a court-appointed special advocate (“CASA”), was assigned to the case.
In July 2007, J.B. and T.B. were placed with the maternal grandparents and provided with services from Youth Villages. In August 2007, J.B. started the school year in the second grade but experienced academic difficulties and was placed back in the first grade. In October 2007, J.B. was exhibiting unruly and aggressive behavior at school to such an extent that he was sent to an alternative school. Shortly thereafter, the juvenile court determined that J.B. was a multi-needs child and J.B. was admitted to Hill Crest Behavioral Health Systems Hospital (“Hill Crest”), *521 where he was diagnosed as suffering from bipolar disorder, post-traumatic stress disorder, impulse-control disorder, and ADHD. J.B. was prescribed an anti-anxiety drug (clonazepam), two mood stabilizers (risperidone and oxcarbazepine), and an ADHD medication.
In January 2008, the juvenile court granted the parents unsupervised weekend visitation with the children. In early April 2008, the juvenile court amended its visitation order on motion of the children’s guardian ad litem, who alleged that the children had reported that the father was abusing alcohol during weekend visitations. The juvenile court ordered the parents not to have any alcoholic beverages in the home while the children were present, made the father’s visitation subject to the mother’s supervision, and directed the father to have a substance-abuse assessment. The assessment was negative for all controlled substances.
In late April 2008, teachers at J.B.’s school reported to Woods, the CASA, that J.B. was exhibiting inappropriate sexual-ized behavior at school. When the teachers questioned J.B. about his behavior, J.B. stated that he had seen pictures of naked women that his father kept in a basement room. The teachers reported that J.B. tended to be very sleepy on Mondays; J.B. explained that his father or his brother had kept him up until late at night and that he did not get any rest. The teachers noted that J.B.’s sexualized behavior was more extreme on Mondays after he had spent the weekend with his parents and that such behavior diminished as the week progressed.
After hearing evidence that both parents were employed, that they had rented a two-bedroom house in Adamsville, and that they had complied with all aspects of DHR’s service plan, the juvenile court, on June 26, 2008, returned custody of the children to the parents, ordered family counseling, and required the father to undergo individual counseling. Woods, the CASA, visited the parents’ home in July 2008, shortly after the children had been returned to the parents. On that occasion, Woods said, the father had become very angry and had retreated to the bedroom, after which J.B. had come out of the bedroom with a “funny little smile” and had said to the mother: “Daddy’s in the bedroom doing what he does when you’re in there.” According to Woods, the mother asked what the father was doing and J.B. would not say. Woods returned the following day and the mother acknowledged to Woods that the father “had problems, and she was going to lose her children again because of that, but that [the father] needed help.” In subsequent visits to the home, Woods noticed that the mother had bruises on her face and that T.B. had a black eye; the mother, however, denied any abuse by the father. Then, in October 2008, the mother informed Woods that she planned to take the children, leave the marital home that day without the father’s knowledge, and go to live with the maternal grandparents. The mother carried out her plan the following day, and, for five months, the mother and the children lived with the maternal grandparents and Z.B.
In March 2009, J.B. and T.B. were removed from the mother’s custody after DHR received a child-abuse-and-neglect report from the staff at T.B.’s school. T.B. had defecated in his pants, and, in helping him to clean himself, the school nurse had seen that T.B.’s anus was enlarged and irritated. When the nurse asked T.B. what had happened, T.B. reported that his half brother, Z.B., had sexually abused him. On March 30, 2009, the juvenile court awarded custody of J.B. and T.B. to DHR; directed that J.B., T.B., and Z.B. submit to forensic interviews at *522 the Prescott House Children’s Advocacy Center (“Prescott House”) and to forensic examinations at the Children’s Hospital Intervention and Prevention Services Clinic; and ordered that J.B., T.B., and Z.B. have no unsupervised contact with each other. Mary Beth Thomas, the clinical director of the Prescott House, conducted several forensic interviews with J.B. and T.B. in 2009 and 2010; those interviews were recorded on videodisc.
J.B. and T.B. were placed in separate foster homes and enrolled in the Alabama Clinical School, a special school for preado-lescent children who are victims or perpetrators of child sexual abuse. The mother was granted supervised visitation, and the father’s visitation rights were made subject to the discretion of the children’s counselors. The counselors directed that the father have no contact with the children. For the next two years, T.B. remained in the Alabama Clinical School; J.B. attended both the Alabama Clinical School and the Boyd School, a similar facility.
On July 19 and 21, 2010, the parents filed motions for funds to hire an independent psychological expert to examine the children. The juvenile court denied those motions. On November 17 and 18, 2010, the parents filed motions in limine to exclude the recorded interviews of the children at the Prescott House. The parents argued that the recorded interviews contained hearsay statements of the children, of which the parents had not been given sufficient prior notice to afford them a fair opportunity to rebut the statements, as required by § 12-15-310(d), Ala.Code 1975. The parents also insisted that, in order to have a fair opportunity to rebut the children’s recorded statements, they should be provided with funds to employ an independent expert to conduct a psychological evaluation of the children. The juvenile court denied the motions in limine.
The record indicates that, at a hearing on November 23 2010, DHR attempted to introduce a videodisc of the children’s Prescott House interviews and the parents objected, raising the § 12-15-310(d) requirement of a “fair opportunity to rebut” the children’s hearsay statements concerning sexual abuse and renewing their motions for funds to hire an independent psychological expert. The juvenile-court judge to whom the case was then assigned, Judge Alan Summers, Jr., granted the motion, stopped the hearing, and directed the parties to reach an agreement as to the expert who would be hired. When the parties could not agree, Judge Summers appointed Dr. Steven Bell to conduct evaluations of the children. Dr. Bell declined to accept the appointment and suggested that the parties contact psychologists at the Sparks Clinic, who also declined to accept the appointment. Judge Summers then informed the parties that he would choose a psychologist.
On June 16, 2011, DHR filed petitions to terminate the parental rights of the mother and the father. The cases were assigned to Judge Sandra Storm, and the petitions were tried on November 28-29 and December 19, 2011.
Deegan Malone, a clinical therapist whose specialty is problematic sexual behavior in preadolescent children, conducted psychosexual evaluations of J.B., T.B., and Z.B. in February and March 2009. Over the parents’ hearsay objections, Malone’s clinical reports were admitted in evidence. With respect to J.B., who was then nine years old, Malone’s clinical report states, in pertinent part:
“When asked about sexual touching, [J.B.] stated nothing and denied all questions related to sexual abuse; however, he did report that he and [Z.B.] *523 had a secret and they did dirty things and it was a secret
With respect to T.B., who was then seven years old, Malone’s clinical report states, in pertinent part:
“[T.B.] indicated during drawing that he wanted the cops to come pick up his father. As a matter of fact, he even asked how to spell ‘cops,’ ‘catch,’ and then ‘daddy.’ ... [T.B.] was very up front and honest about [Z.B.] and [J.B.] doing nasty things. He stated that [Z.B.] tries to do nasty things with him at times, but he does not let him. He also stated that [Z.B.] and [J.B.] would look at pornography while at [the parents’ house],... He has seen [J.B.] and [Z.B.] act out nasty with each other. When I asked [T.B.] to indicate what ‘nasty’ meant, he said, “You know what men do to girls.’ ”
With respect to Z.B., who was then 13 years old, Malone’s clinical report stated, in pertinent part:
“[Z.B.] reported that he was exposed to pornography by his brothers’ biological father, [J.W.B.]. [Z.B.] indicated that he saw it on one occasion and [the father, J.W.B.,] told him to leave. The second time, [the father, J.W.B.,] allowed him to stay and watch the DVDs.... He also admits to sexual talk with his brothers and ‘acting gay.’ He was unclear about what that actually meant.”
When Malone was asked whether she believed that either J.B. or T.B. had been sexually abused, she stated: “I believe both — I believe all three kids were exposed to some type of sexualized behaviors. The gravity and the enormity or limitedness, no, sir, I cannot speak to that.” She further stated that J.B.’s behavior was “consistent with a child [who had] been sexually abused.” On cross-examination, the mother’s counsel asked Malone whether she was “trying to imply that sexual abuse is the only thing that could have caused the problems these children are having?” The following then occurred:
“A. [by Malone]: No. There’s all kinds of psychological issues or behavioral problematic issues that come up with every kid. But based on the actions, the acting out the — you know, the defecating, the bed wetting and those things, when you have a multitude of those and the child reporting sexualized behaviors within the home, you kind of go with what — not only what the behaviors are for sure, you know, because some of the signs of sexual abuse are the defecating, the bed wetting, the fire starting, the cruelty to animals, the excessive clothes, the hoarding, those kinds of things, aggressive behavior. There’s a long list of characteristics that we go by. If it was just defecating or bed wetting, then you may want to go to [post-traumatic stress disorder] or you may want to look at anxiety disorder or something like that.
“Q. [by the mother’s counsel]: Of those factors that you just mentioned, how many would you say have been exhibited by [J.B.]?
“A. His aggressiveness, lies, stealing, bed wetting, defecating, and those things. So, he’s got a lot, I mean, as far as those behaviors. He’s demonstrated some of those behaviors in the different facilities.”
The parties accepted Mary Beth Thomas as an expert witness on forensic interviewing and child sexual abuse. At trial, videodiscs of three interviews Thomas had conducted with T.B. — in March 2009, January 2010, and June 2010 — and of two interviews she had conducted with J.B. — in January 2010 and August 2010 — were admitted in evidence over the parents’ hearsay objections. Counsel for the parents *524 and the father’s guardian ad litem acknowledged that they had previously viewed the videodiscs, but that their viewing had occurred a year earlier. Judge Storm gave the parties and their counsel the opportunity to view the videodiscs again before they were admitted in evidence. Before the videodiscs were played in court, the following occurred:
“MR. MCMUNN [mother’s counsel]: Your Honor, my client does not want to see this video. She had a problem with it yesterday and I would ask ... that she be excused while the video is being played.
“THE COURT: She can be excused, if she wants to. She’s seen them before.
“MR. MCMUNN: No, she hasn’t.
“THE COURT: You’ve never seen them.
“THE MOTHER: No, ma’am, I don’t want to see them.
“THE COURT: You don’t want to see what your children say?
“THE MOTHER: No. I will be too upset.
“THE COURT: Would you really?
“THE MOTHER: I cannot sit through this. I’m just going to be honest with you. I’m sorry, but—
“THE COURT: That’s all right with me. It just — if she doesn’t want to— you have never seen what your children say in these tapes, correct? I thought she had. You have not.”
In the January 2010 interview, T.B. stated that Z.B. had “put a hole in his bottom” (which he indicated by circling the buttocks on an anatomical drawing), with “the thing between [Z.B.’s] legs” (which he indicated by circling the penis on an anatomical drawing). T.B. also said that his father had “put a hole in [Z.B.’s] bottom” with “the thing between [the father’s] legs.” When Thomas inquired whether T.B. had seen the father “do that” to Z.B., T.B. said that he had not seen it but that his foster mother, Mrs. F., had told him. In the June 2010 interview, T.B. stated that his father had “put a hole in his bottom” with “the thing between [the father’s] legs” when T.B. was in his own bed and that Z.B. had done the same thing to him at the maternal grandmother’s house.
In J.B.’s January 2010 interview, he stated that Z.B. had been “humping” his little brother, T.B., or “digging holes in [T.B.’s] butt.” J.B. stated that he had seen Z.B. pull T.B.’s pants down and “hump” T.B. at the maternal grandmother’s house. In J.B.’s August 2010 interview, he stated that he did not get to visit with his father anymore because his father had “put a hole in us [indicating T.B. and himself].” J.B. said that, one day when he was eight years old and his mother had gone to the grocery store, his father had grabbed him, had pulled down his pants, and had “put a hole in his butt” by “sticking his thing” (which he indicated by circling the penis on an anatomical drawing) “in [J.B.’s] butt.” J.B. stated that, when the father had heard the mother opening the front door, the father had pulled up J.B.’s pants. J.B. also said that he and Z.B. had watched “sex movies” with his father. Finally, J.B. said that Z.B. had “humped” both T.B. and him more than one time at the maternal grandparents’ house.
Leslie Tyree, who became the children’s foster-care worker in October 2009, testified that both parents had cooperated with DHR in completing the required components of the reunification plan for the family, including undergoing counseling, until September 2010, when, Tyree said, the father had “exploded” at an Individualized Service Plan meeting and refused to continue with counseling. Tyree testified that the mother had also stated that she was *525 not getting any benefit from counseling and would not continue with the sessions. Heath Chancey, a counselor who had been seeing the parents for a year, stated that the parents had failed to return his telephone calls regarding counseling appointments. The mother acknowledged at trial that she had refused to attend any further counseling sessions; the father denied that he had ever refused to continue with counseling.
Tyree stated that, after J.B. and T.B. had been discharged from the Alabama Clinical School program in May 2011, each child had been placed in a separate therapeutic foster home — J.B. with G.B. and G1.B., Sr., a paternal great-aunt and great-uncle, and T.B. with M.B. and G1.B., Jr., a paternal aunt and uncle. J.B. was readmitted to Hill Crest on June 27, 2011, after he had choked a young female child at summer camp. He remained at Hill Crest for two months and then returned to the therapeutic foster home. On October 17, 2011, J.B. was enrolled in the Boyd School, where he remained for a month before being dismissed for sexually inappropriate overtures to a roommate. Tyree stated that J.B. was currently on the acute-care unit at Hill Crest and that DHR had arranged for his admission to the Phoenix Program at Hill Crest (a program that treats boys between the ages of 11 and 17 who act out with sexual behaviors) after his release. T.B., on the other hand, was doing well in his therapeutic foster home, and his foster parents wanted to adopt him.
Tyree testified that she had not located (and the mother had not suggested) any maternal relative resources who could serve as a placement for J.B. and T.B., but that the father had proposed his mother as a viable alternative to the termination of his parental rights. Tyree conducted a home evaluation and a criminal-background check of the paternal grandmother and determined that she was unsuitable because she had a prior domestic-violence conviction and her husband had a previous child-abuse-and-neglect case with DHR. Tyree also said that the paternal grandmother had reported that she had mental-health issues but that she had not been seeing a doctor.
At the time of trial, the father was living with his parents. He had been working for a year as a parking-lot sweeper, for which, he said, he was paid approximately $820 per week in cash. The father stated that he drinks 24 beers during a weekend, “like anybody.” He acknowledged that he had been convicted of driving under the influence of alcohol, harassment, trespassing, and other “small misdemeanors,” but he denied that he was guilty of any domestic-violence offense against the mother, and, when asked if he understood what domestic violence was, he stated: “Domestic violence ain’t hitting or anything like that. It’s actually trying to kill somebody.”
The father also denied having had pornography in the house in Adamsville and having invited Z.B. to watch pornographic movies with him in the basement. He specifically denied having had possession of a movie called “Show Girls.” He categorically denied having sexually abused Z.B., J.B., or T.B., and he stated that all three children had lied about him. He acknowledged that J.B. had been “sexually acting out,” but, he said, “I do not know where he’s getting it from ... because my kids ain’t never seen no kind of porno-graphies.” In answer to the question whether he was aware that J.B. and T.B. had a problem with encopresis, the father stated that J.B. had told him that he “would stop when he came home.” The father also insisted that “everything was going great when [he] had [the children] in *526 Adamsville at [his] house,” because, he said, the children were well-behaved and normal. When presented with evidence to the contrary, the father simply denied that the evidence was true.
At the time of trial, the mother was homeless. She stated that she had recently left a Salvation Army center because “women were getting raped there,” that she had “no particular” residence, and that she stayed with different friends. She testified that she had been employed by Professional Transportation, Inc., for one week, driving a van for the railroad and earning $7.25 per hour and $.13 per mile. Before that position, she had been employed at a fast-food restaurant for eight weeks, and, before that, she had been unemployed for a year. She testified that she had done everything DHR had asked her to do but that she would not consider more counseling because she had undergone counseling for six years and she was “through with that.” The mother acknowledged that she and the father had had a volatile relationship marked by numerous separations, but, she said, she was currently separated from the father in hopes of getting her children back. She stated that she “did not know what to believe” concerning the allegation that Z.B. had sexually abused J.B. and T.B. but that she did “not believe” that the father had sexually abused any of the children. She admitted that, during the time the father had been under an order to have no contact with the children, she had allowed the father to drive her to a park where she was to visit with the children. On that occasion, the father had remained in the vehicle, in the view of the children, while the mother visited with the children in the park. The mother also acknowledged that she had an audio recording of a message from the father to the children and that she had played the recording for the children during that same period.
In rebuttal, the children’s guardian ad litem presented the testimony of Cindy Thomas, who had succeeded Woods as the CASA. Thomas stated that she had gone to the parents’ home in Adamsville in 2008, when the parents had unsupervised visitation with the children, and had found a movie called “Show Girls.”
On February 29, 2012, the juvenile court entered judgments terminating the parental rights of the mother and the father to both children.

Standard of Review

“The standard of review applied by appellate courts in reviewing the propriety of decisions to terminate parental rights is well established. ‘The trial court’s decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.’ Ex parte State Dep’t of Human Res., 624 So.2d 589, 593 (Ala.1993). That ‘presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility.’ Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
“This court has explained the juvenile court’s authority to terminate parental rights as follows:
“‘The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to the custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from *527 the parent’s custody would be in the child’s best interest.... In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated....’
“Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted). The trial court’s decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995).
“ ‘To terminate parental rights, the trial court must first determine from clear and convincing evidence that the child is dependent. S.F. v. Dep’t of Human Res., 680 So.2d 346 (Ala.Civ.App.1996). The trial court must then determine that there exists no alternative to termination. L.A.G. v. State Dep’t of Human Res., 681 So.2d 596 (Ala.Civ.App.1996).’
“M.W. v. Houston Cnty. Dep’t of Human Res., 773 So.2d 484, 485-86 (Ala.Civ.App.2000).”
A.K. v. Henry Cnty. Dep’t of Human Res., 84 So.3d 68, 69-70 (Ala.Civ.App.2011).
The grounds for termination of parental rights are set out in § 12-15-319, Ala. Code 1975, which provides, in pertinent part, as follows:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for [the] needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by the treatment of a sibling.
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an *528 administrative review or a judicial review.”
I.
A. Both parents argue that the juvenile court erred in admitting, over their hearsay objections, clinical reports regarding the psychosexual evaluations of J.B., T.B., and Z.B. by Deegan Malone in February and March 2009 and the videodiscs of forensic interviews with J.B. and T.B., conducted by Mary Beth Thomas at Prescott House in 2009 and 2010. The parents contend, as they did in the juvenile court, that the clinical reports and the interviews contained hearsay statements of the children that they had had no fair opportunity to rebut, as required by § 12-15-310, Ala. Code 1975.
Section 12-15-310, provides, in pertinent part:
“(c) A statement made by a child under the age of 12 describing any act of sexual conduct performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in all dependency cases brought by the State of Alabama acting by and through a local department of human resources if:
“(1) The statement was made to a social worker, child sexual abuse therapist or counselor, licensed psychologist, physician, or school or kindergarten teacher or instructor; and
“(2) The juvenile court finds that the time, content, and circumstances of the statement provide sufficient in-dicia of reliability. In making its determination, the juvenile court may consider the physical and mental age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, and any other factor deemed appropriate.
“(d) A statement may not be admitted pursuant to this section unless the proponent of the statement makes known to the adverse party the intention of the proponent to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to rebut the statement. This child hearsay exception applies to all hearings involving dependency including, but not limited to, the 72-hour hearing requirement, the adjudicatory hearing, and the dispositional hearing. The exception contained in this subsection shall not apply to a criminal proceeding or charge.”
The parents maintain that they had no fair opportunity to rebut the children’s statements because they had not been provided with the funds to hire an independent psychological expert to evaluate whether the children were telling the truth. Judge Sandra Storm concluded that the parents had waived that argument, and we agree.
As previously stated, Judge Alan Summers, Jr., to whom the cases had been assigned before they were reassigned to Judge Storm, had granted the parents’ motion for funds to hire an independent expert to conduct a psychological evaluation of J.B. and T.B. and had directed the parties to agree on the expert to be hired. When the parties could not agree, Judge Summers appointed Dr. Steven Bell to conduct evaluations of the children. Dr. Bell declined the appointment and suggested that the parties contact psychologists at the Sparks Clinic, who also declined the appointment. Judge Summers stated that he would choose a psychologist, but he never did so before the cases were reassigned to Judge Storm. The parents did not raise that issue with Judge Storm until a year later, in November 2011, when the termination-of-parental-rights trial was *529 underway. Judge Storm determined that the parents had waived the right to have an independent expert evaluate the children. She stated:
“[I]t is not good for children to have to talk over and over and over about these kinds of things. And we’re not going— I’m not going to have another expert. I’ll just tell you that now. All right. I just ruled for Judge Summers, ruled on my own. We already have an expert. We’re in the middle of a termination of parental rights trial and not one of you raised this issue before the trial. We’re not going to raise it now.”
As Judge Storm’s colloquy with the parents’ counsel indicates, the parents waived the issue by failing to invoke a ruling from Judge Summers or, after reassignment of the cases, to bring the matter to the attention of Judge Storm before trial. Cf. Waddell v. Colbert Cnty.-Northwest Alabama Healthcare Auth., 97 So.3d 178, 183 (Ala.Civ.App.2012) (rejecting a party’s “attempt to ‘sandbag’ the trial court” by raising on appeal an issue that the party had ostensibly abandoned by taking action at odds with his prior position and by failing ever to bring the issue to the trial court’s attention again).
B. The father argues that the recorded interviews of the children at Prescott House were erroneously admitted because they failed to satisfy the corroboration requirement of § 15-25-34, Ala.Code 1975. That section, a part of “The Child Physical and Sexual Abuse Victim Protection Act,” § 15-25-30 et seq., Ala.Code 1975, a statute relating to criminal procedure, provides:
“Before a statement may be admitted pursuant to this article on the grounds that the child declarant is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.”
(Emphasis added.) Section 15-25-34 has no application here because the statements of J.B. and T.B. were not admitted pursuant to § 15-25-30 et seq., but pursuant to § 12-15-310(c). Cf. § 12-15-310(d) (by providing that “[t]he exception contained in this subsection shall not apply to a criminal proceeding or charge,” the legislature has given each statute a separate field of operation).
II.
The father argues that the juvenile court had no authority to terminate his parental rights because he was not adjudicated the children’s “legal” father. The father bases that argument on the fact that, early on in these proceedings, the juvenile court had ordered him to submit to a DNA paternity test. The father did so, but he never paid the testing fee and no DNA test was performed. When the father was asked at trial why he had not paid the fee, the following occurred:
A. [by the father]: It wasn’t important at the time because I know they’re my kids. That’s like kind of actually wasting money. That’s something I really ain’t got. I mean, I got two twins.
“THE COURT: You got what?
“THE WITNESS: I got two twins that look just like me.
“THE COURT: Are you on their birth certificate?
“THE WITNESS: Yes, ma’am.”
No formal adjudication of paternity was necessary in these cases because, as the juvenile court recognized, J.W.B. was the presumed father of the children. Pursuant to § 26-17-204(a)(4)(B), Ala.Code 1975, “[a] man is presumed to be the father of a child if ... after the child’s birth, he and the child’s mother have married, ... and ... with his consent, he is named *530 as the child’s father on the child’s birth certificate.”
III.
The parents maintain that the judgments terminating their parental rights are neither supported by the facts nor consistent with applicable law. In its judgments, the juvenile court stated:
“The court heard testimony of witnesses who were first duly sworn. The court received into evidence certain properly authenticated exhibits. After due consideration of same, the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the children] named herein [are] dependent child[ren], pursuant to § 12-15-102, Ala.Code 1975.
“The mother has been involved in a violent relationship with the father of [these children]. The child[ren were] originally removed from the mother and father due to this violence and an unstable relationship. The child[ren] were returned to the mother and father two years later.
“Nine months later, [the children were] again removed from the parents due to allegations of sexual abuse by a half brother who is the son of the [mother]. There are also allegations of sexual abuse by the father.
“The children report] being sexually abused by the half brother and by [their] father on numerous occasions .
“The child[ren] ... have been in treatment at Alabama Clinical Schools for sexual abuse and sexualized behavior.
“The father has not been allowed visitation with the child[ren] due to the allegations made to social workers and to the Prescott House in Birmingham. The expert witness from the Prescott House testified that she finds the abuse reports of the children to be credible. “The mother has failed to protect her children in this matter. She has a violent and abusive relationship with the father but has continued to reunite with him over time[, t]hereby placing her children in harm’s way.
“At the time of the trial in this termination-of-parental-rights petition, the mother is unclear as to who to believe regarding the sexual abuse of her children and chooses to remain in a dependent relationship with the father.
“The childfren] herein [have] been in the custody of the JCDHR since 2009 and [have] been placed in relative placements, foster homes, and a treatment facility.
“The Court does find, pursuant to § 12-15-319, Code of Alabama 1975, that the mother and father are unwilling and unable to discharge their responsibilities to and for the child[ren]; that the conduct and condition of the mother and father is such as to render them unwilling and unable to properly care for and protect the child[ren], and that such conduct and condition are unlikely to change in the foreseeable future.
“The mother and father have failed to adjust their circumstances to meet the child[ren’s] needs, pursuant to § 12-15-319, Code of Alabama 1975, and § 12-15-301, Code of Alabama 1975.
“The Court also finds that there are no suitable relative resources willing or able to receive custody of the children]. “The court finds that there is no viable alternative to termination of parental rights in this case.
“In addition, the court finds that the State of Alabama [DHR] is willing and able to accept permanent legal custody, as provided in § 12-15-320, Ala.Code 1975.
*531 “In accordance with Public law 96-272, as amended by Public Law 105-89 and § 12-15-319, Ala.Code 1975, this court finds that it would be in the best interest of the child[ren] named herein to terminate the parental rights of the children’s mother and father.
[[Image here]]
“This court finds that reasonable efforts to reunite said child[ren] with family have been made by the [DHR], and that such efforts at reunification have failed based on the evidence presented at trial. Further, the court finds that the [DHR] has made reasonable efforts to finalize the permanency plan[s] for [J.B. and T.B.], and concurs with the plan for the child[ren] of: adoption by an identified resource.”
The juvenile court’s judgment is consistent with applicable law and fully supported by the evidence presented at trial. The juvenile court was presented with evidence from which it could reasonably have been clearly convinced that the mother and the father are financially, mentally, and emotionally unable to care for their children. At the time of trial, the mother was homeless and the father was living with his parents. Although both parents were then employed, their employment history is checkered at best. Both parents suffer from cognitive deficits and emotional disturbances that prevent them from taking care of themselves in a healthy manner, much less ensuring that their children thrive in a safe environment. See § 12-15 — 319(a)(2), Ala. Code 1975.
The juvenile court also could reasonably have been clearly convinced that the father had sexually abused the children and that the mother had either been willfully blind to the need to protect the children from that abuse or incapable of protecting them from the abuse. See § 12 — 15—319(a)(3), Ala.Code 1975. The mother is a victim of physical abuse by the father, yet she minimized her injuries and his fault, and repeatedly reconciled with him, no doubt because she was financially dependent upon him. The juvenile court was authorized to find that, because the mother could not protect herself from the father, she did not have the capacity to protect the children from the risk of harm by the father. A fortiori, because the mother refused to believe that the father had abused the children, she was unable to protect the children from the abuse. See B.M. v. State, 895 So.2d 319, 334 (Ala.Civ.App.2004) (holding that father’s refusal to believe that mother had perpetrated Mun-chausen’s-syndrome-by-proxy abuse on child indicated that he could not protect the child from abuse and that he was, therefore, “unable or unwilling to discharge [his] responsibilities to and for the child”).
Although the parents completed many, if not most, of DHR’s service-plan requirements — including attending classes on parenting skills, anger management, and domestic violence — they failed either to absorb the lessons presented or to apply the lessons to their own lives. Thus, despite DHR’s having made reasonable efforts for over five years to rehabilitate the parents, those efforts had failed. See § 12 — 15—319(a)(7), Ala.Code 1975. Moreover, the juvenile court could properly have determined that the parents’ refusal to continue with individual and couples’ counseling, a service that might have helped them to apply what they had heard in the classes described above, indicates a lack of effort to adjust their circumstances to meet the needs of the children. See § 12 — 15—319(a)(12), Ala.Code 1975.
The juvenile court’s judgments state sufficient grounds, supported by clear and convincing evidence, for the termination of both parents’ rights.
*532 IV.
The parents contend that the juvenile court was not presented with clear and convincing evidence that no viable alternatives to the termination of parental rights existed. Clear and convincing evidence is “‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)).
The father insists that placement of the children with the paternal grandmother was a viable alternative to termination of his rights. DHR’s reasons for rejecting the paternal grandmother as a relative resource—that she had a prior domestic-violence offense, that her husband had a prior child-abuse-and-neglect case with DHR, and that the paternal grandmother herself suffered from mental-health issues for which she was not seeing a doctor— could properly have been determined by the juvenile court to be valid. To have placed the children with a custodian whose deficits mirrored those of the parents from whose custody they had been removed would have been unthinkable.
Citing L.R. v. C.G., 78 So.3d 436 (Ala.Civ.App.2011), the mother contends that she was making progress toward being able to take care of the children, and, she says, because both children were currently placed in therapeutic foster homes with relatives, maintenance of the status quo while she continued to make progress was a viable alternative to the termination of her rights. L.R. is inapt. In that case, the mother had received a suspended sentence and was on probation for a drug conviction; she was employed and had established a stable residence. The children were in a stable environment with the maternal grandparents, and the mother “desired that she be allowed to continue to visit with the children and develop her relationship with them as she continued to improve her circumstances.” 78 So.3d at 443. In the present case, the mother had a spotty to nonexistent history of regular employment. At the time of trial, she had been employed for only one week and her most recent prior employment had lasted only eight weeks. The mother, by her own admission, was homeless, stayed with friends, and lived at “no particular residence.” At the time of trial, J.B. was not in a stable environment; he was hospitalized in the acute-care unit at Hill Crest, and any improvement in his condition would result only in his being transferred to another treatment center within the same hospital. Although T.B. was currently residing with M.B. and G1.B., Jr., a paternal aunt and uncle who were willing to adopt him, Leslie Tyree testified that M.B. and Gl.B., Jr., were not willing to “tak[ej permanent legal custody” of T.B. because “they did not want to have any interaction with the biological family.”
Finally, the juvenile court was presented with evidence from which it could have found, clearly and convincingly, that the mother had failed to make any appreciable progress toward being able to parent her children. The evidence indicated that the mother had not only consistently denied or minimized the father’s physical abuse of her, but also that she had refused to entertain the idea that the father had sexually abused the children and, consequently, that she had been derelict in adhering to the safety plan for the children and the no-contact order under which the father had been placed. The record suggests that Judge Storm was taken aback when she learned that the mother had never seen or heard the children’s Prescott House interviews yet declined to watch the *533 videodiscs of those interviews. The juvenile court could properly have concluded that, unless the parental rights of both the father and the mother were terminated, there was no guarantee that the mother would not allow the father access to the children in the future. At trial, the mother testified that she and the father “still get along,” and she said that they had separated only in order to allow her to “try and get custody” of the children. She stated that she was not getting any benefit from counseling and that she was “through with” counseling — a service provided by DHR that might have made a difference in her life and in the lives of her children.
The juvenile court’s conclusion that the evidence clearly and convincingly demonstrated that there were no viable alternatives to termination of the parents’ rights is supported by the record, and its judgments are due to be upheld.
2110550 — AFFIRMED.
2110568 — AFFIRMED.
THOMPSON, P.J., and BRYAN, J., concur.
MOORE, J., concurs in part and concurs in the result in part, with writing.
THOMAS, J., recuses herself.

. Although the Alabama Department of Human Resources filed the briefs on appeal in this matter, the Jefferson County Department of Human Resources filed the underlying dependency petitions and petitions to terminate the parents’ parental rights in the juvenile court and was the agency responsible for overseeing the underlying cases. The county departments of human resources are state agencies. See Ex parte Department of Human Res., 716 So.2d 717, 718 (Ala.Civ.App.1998).
"The county departments of human resources serve as agents of the State Department of Human Resources; the State Department is empowered to designate the county as its agent and to assist the counties in their various duties when necessary. See § 38-6-2, Ala.Code 1975; Admin. Rules 660 — 1—2—.01(g) and 660-1-2-.02”
State Dep’t of Human Res. v. Estate of Harris, 857 So.2d 818, 819 n. 1 (Ala.Civ.App.2002).