MOORE, Judge.
K.A.P. (“the father”) appeals from a May 27, 2008, judgment entered by the Baldwin Juvenile Court terminating his parental rights to J.A.P. and L.M.P. (“the children”) on a petition filed by D.P. and C.P. We affirm.

Facts

J.A.P. was born on May 7, 2001, to the father and T.R. (“the mother") during their common-law marriage. Not long after that child’s birth, the Baldwin County Department of Human Resources (“DHR”) received an anonymous report that the parents were neglecting the child. J.A.P. was removed from the parents’ home and placed with the mother’s sister, T.M., for approximately three months. The father testified that, although the child was eventually returned, the family underwent intense oversight by DHR for the next year. During that time, the father took classes, attended monthly meetings with DHR, and was subjected to periodic evaluations. At the end of the process, DHR did not file a petition to terminate the father’s parental rights to J.A.P.
The father and the mother separated at some point. The father testified that, upon their separation, he petitioned “the court” and received “primary custody” of J.A.P. According to the father, from 2001 to 2004, he acted as the primary caregiver for J.A.P. The father testified that he had provided a suitable home for J.A.P. and that he was a good father.
The parents eventually reunited. On April 8, 2004, the mother gave birth to L.M.P. The family lived together after-wards. The father testified that he was the primary caregiver for the children, although he also depended on his mother-in-law and his parents, who lived within four blocks of the family. The father worked as an arborist to provide for the family. In addition, the children received a great deal of governmental aid, such as Medicaid, day-care payments, and Special Supplemental Food Program for Women, Infants, and Children (“WIC”) benefits. See § 22-12C-1, Ala.Code 1975; see also Moseley Grocery v. State Dep’t of Pub. Health, 928 So.2d 304, 306 (Ala.Civ.App.2005) (explaining the WIC program). The father testified that the children were designated as recipients of .these programs because the mother was in drug rehabilitation.
On March 23, 2005, the father was arrested for lying to a police officer who was investigating a homicide that had occurred the day before. That same day, the mother was arrested for an unnamed crime. The father’s mother-in-law took custody of the children when both parents were confined to jail. The mother served 30 days in jail and was released. Three days later, on April 27, 2005, the mother died of unstated causes.
After the mother’s death, the father remained in jail. In early June 2005, the father was charged with capital murder. The father was never released from jail following that charge. The father entered a guilty plea to murder and was given a life sentence. At the time of the trial, the father was serving that sentence.
The record contains only vague evidence of who had custody of the children immediately following the death of the mother. By court order dated November 22, 2005, T.M. obtained temporary custody of the children; that custody became “permanent” as of December 19, 2005. However, by that point, T.M. had already turned to D.P. and C.P., friends of the children’s *815 great-aunt, to help with L.M.P. C.P. testified that, about two months after the mother died, she and D.P. started caring for L.M.P. on weekends to help out T.M. They soon became attached to L.M.P. and informed T.M. and the children’s extended family that they were interested in adopting both children even though they had not yet met J.A.P.
In 2006, T.M. indicated to C.P. that she was enrolling in school to become a corrections officer. The lengthy hours needed for instruction would prevent T.M. from properly caring for the children. D.P. and C.P. stai'ted keeping the children every day as of February 7, 2006. On September 11, 2006, T.M. signed an agreement relinquishing custody of the children to D.P. and C.P. The father did not sign that document. On September 27, 2006, D.P. and C.P. filed a petition in the juvenile court to obtain legal custody of the children. The father filed an answer to that petition, objecting to the change of custody. Apparently, on April 4, 2007, the juvenile court entered a judgment awarding custody of both children to D.P. and C.P. over the father’s objection.[1]
D.P. and C.P. filed a petition to terminate the parental rights of the father on May 4, 2007, for the purpose of facilitating the adoption of the children. The father filed an answer contesting that petition on October 4, 2007.
The juvenile court held a hearing on the petition on March 27, 2008. At that hearing, C.P. testified that she and D.P. resided in Pensacola, Florida. C.P., who was 40 years old at the time of the hearing, worked as a librarian, and D.P., who was 46 years old, worked as a teacher, both in the Escambia County School District. They had been married for 10 years and had no other children living in their home. C.P. testified that J.A.P. was six years old and had been diagnosed with severe attention deficit/hyperactivity disorder. As a result, he was in his second year of kindergarten. C.P. testified that she and D.P. had paid a private psychologist to help J.A.P. and that he was now reading and performing well in school. L.M.P. was almost four years old and was a happy preschooler.
C.P. testified that the April 4, 2007, judgment restricted the father from directly corresponding with the children. The father had sent correspondence to the children, but C.P. and D.P. did not allow the children to read the letters; instead, they saved the letters and put them in a box. According to C.P., the father had never attempted to telephone the children. The father also wrote D.P. and C.P. directly, but they did not respond to those letters. D.P. and C.P. did allow the children to receive correspondence from their other relatives and to visit their grandparents, who lived in Baldwin County, and their uncle, who lived in Arkansas but sometimes came to Baldwin County.
C.P. testified that the father’s parental rights should be terminated because he could not provide for the children’s emotional or financial needs or perform any normal parental duties while incarcerated. C.P. stated that the father had not provided any support for the children while they had been in her custody. C.P. testified that she and D.P. provided for the children with the assistance of $910 per month in Supplemental Security Income benefits, which they used to defray the $7,000 per year cost of day care.
C.P. understood that the father may become eligible for parole, but by that time the children would be near or over the age of majority. C.P. testified that the chil *816 dren needed stability, particularly J.A.P., in the meantime and that the father could not provide that stability. In addition, C.P. testified that she thought it would be inappropriate for the children to visit the father while he was incarcerated and that he was not a good role model for them. C.P. testified that none of the children’s relatives had come forward to seek custody of the children and that no one else was available to care for the children. C.P. testified that in her opinion, as the children’s custodian, it was in the children’s best interests for her and D.P. to adopt them.
C.P. testified that if the juvenile court terminated the father’s parental rights, she and D.P. would adopt the children, but she did not know if the adoption would be through Alabama or Florida law. C.P. originally testified that if the juvenile court did not terminate the father’s parental rights, she did not know whether she and D.P. would maintain custody of the children. Later, however, she clarified that she and D.P. would still be willing to care for the children until they reached the age of majority.
The father testified that he had pleaded guilty to murdering a drug dealer who was not related to his family. He had been in jail since March 2005, serving his life sentence. The father maintained that he would be eligible for parole in 10 to 15 years but that he would be eligible for work release and weekend passes in 2 to 7 years. The parole board would have the discretion to decide his dates for work release and parole. The father testified that he fully expected he would eventually be released from jail.
The father testified that he had visited with the children twice while he was incarcerated in a jail in Pensacola and that he had seen J.A.P. twice while incarcerated in the Baldwin County jail. He testified that he had also telephoned the children from jail. He last visited with the children on June 7, 2005, and has not been allowed to visit with them since. The father testified that the April 4, 2007, judgment allowed him to correspond with the children, but only through his relatives. He attempted to do so, but, according to the father, C.P. and D.P. would not forward any correspondence to the children.
The father testified that it would not be in the best interests of the children to terminate his parental rights. He testified that it was important to the children to maintain a relationship with their natural family. He testified that the children had a relationship with their extended family that should be preserved. The father also testified that when he got out of jail he wanted to reestablish communication with his children.
The father testified that it would be better for the children to simply maintain the status quo, with D.P. and C.P. having custody of the children, until his release. In the meantime, they could visit him in jail twice a month for five hours at a time. The father testified that he would not be shackled during the visitations, that he would be wearing a pressed white jumpsuit, and that the children could have any refreshments they wanted. The father testified that the children could benefit from his mistakes and that he was still a good role model for them. The father testified that he was taking an eight-week parenting class in jail to learn how to be a “long-distance father” and to reestablish his link to the children. The father stated that his parenting plan was to have as much contact with his children as possible and to guide them to a life better than he had lived. The father admitted that no one, even his relatives, supported his position.
*817 At the close of the evidence, the juvenile court stated:
“First, that the parental rights are to be terminated and that that is due to his conviction, the father’s conviction of and imprisonment for a felony.
“I am also finding that there has been abandonment through the actions that he took to get himself incarcerated.
“I am further finding that there’s been a failure to provide for the material needs of the child[ren]. And that that has occurred for at least six months preceding the filing of the complaint.”
Following that declaration, the father filed two notices of appeal, one relating to each child’s case, on March 27, 2008.
The juvenile court subsequently entered two judgments on May 27, 2008, terminating the father’s parental rights to the children.[2] In those judgments, the juvenile court found three grounds upon which to terminate the father’s parental rights: (1) that the father had abandoned the children; (2) that the father had been convicted of murder, a felony; and (3) that the father has failed to provide for the material needs of the children for six months preceding the date of the filing of the petition.

Issues

The father argues that the juvenile court erred in finding that he had abandoned the children due to his incarceration; that the juvenile court erred in terminating his parental rights for failing to support his children while he was incarcerated; that the juvenile court erred in terminating his parental rights based on his conviction of and imprisonment for a felony; that the juvenile court erred in failing to require D.P. and C.P. to prove that the children were dependent; and that the juvenile court erred in finding that termination of the father’s parental rights served the children’s best interests.

Analysis

Grounds for Termination

The father first argues that the juvenile court erred in failing to require D.P. and C.P. to prove the dependency of the children and in failing to adjudicate their dependency. In Ex parte Beasley, 564 So.2d 950 (Ala.1990), our supreme court held that when a nonparent files a petition for the termination of parental rights, the nonparent must prove the dependency of the child as a threshold matter. 564 So.2d at 954. “For a finding of dependency, the court must consider whether there are grounds for terminating the parental rights.” Ex parte T.V., 971 So.2d 1, 4 (Ala.2007). Section 26-18-7(a), Ala.Code 1975, which provides the exclusive grounds for terminating parental rights, states, in pertinent part:
“If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In determining whether or not a parent is “unable or unwilling to discharge [his] responsibilities to and for the child,” the *818 juvenile court must consider several factors, including:
“(1) That the parent[ ] ha[s] abandoned the child....
[[Image here]]
(4) Conviction of and imprisonment for a felony.”
§ 26-18-7(a), Ala.Code 1975. In addition, when the child is not in the physical custody of the parent, the juvenile court shall consider the “[fjailure by the parent[] to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.” § 26 — 18—7(b)(1), Ala.Code 1975.
In its judgment, the juvenile court found that D.P. and C.P. had proven by clear and convincing evidence that the father had abandoned the children, had been convicted of and imprisoned for a felony, and had failed to provide for the material needs of the children in accordance with the above-referenced statutes. Per § 26-18-7(a), those findings of fact were entered solely to indicate that the father is unable or unwilling to discharge his responsibilities to and for the child, one of the grounds for termination. Therefore, the juvenile court did make a finding of “dependency” within the meaning of Ex parte Beasley.
We next turn to the question whether the evidence supports that finding of dependency. The father argues that the evidence does not support the juvenile court’s finding of dependency because, he says, D.P. and C.P. merely proved that he had been convicted of a felony and was imprisoned for the crime, which he maintains is insufficient as a matter of law to warrant termination of his parental rights.
In J.L. v. State Department of Human Resources, 961 So.2d 839 (Ala.Civ.App.2007), this court noted that conviction of a felony and imprisonment for that crime “ ‘is a factor that the trial court can consider in concluding that the father is not a viable choice for the children’s custody.’ ” 961 So.2d at 849 (quoting K.W. v. State Dep’t of Human Res., 656 So.2d 849, 851 (Ala.Civ.App.1995)). That factor is independent of other factors, such as abandonment. Id. In his dissent in J.L., Presiding Judge Crawley noted:
“The rationale for including ‘[cjonviction of and imprisonment for a felony,’ pursuant to § 26-18-7(a)(4), as a ground for termination is that a parent’s incarcerated status suffices, in and of itself, as a basis for determining that the parent is unable to perform his parental duties and to provide his or her child with a normal home. See generally Gregory D. Samo, Annot., Parent’s Involuntary Confinement, or Failure to Care for Child as Result Thereof, as Evincing Neglect, Unfitness, or the Like in Dependency or Divestiture Proceeding, 79 A.L.R.3d 417, § 7 (1977).”
961 So.2d at 852 (Crawley, P.J., dissenting). Presiding Judge Crawley cited the many decisions from this court in which the court had affirmed the termination of the parental rights of a parent who was incarcerated at the time of the final hearing. 961 So.2d at 852-53 (Crawley, P.J., dissenting) (citing T.B. v. Lauderdale County Dep’t of Human Res., 920 So.2d 565 (Ala.Civ.App.2005); J.A.H. v. Calhoun County Dep’t of Human Res., 865 So.2d 1228 (Ala.Civ.App.2003); G.L.C. v. State Dep’t of Human Res., 777 So.2d 706 (Ala.Civ.App.1999); K.W. v. State Dep’t of Human Res., 656 So.2d 849; A.N.S. v. K.C., 628 So.2d 734 (Ala.Civ.App.1993); M.H. v. E.F.E., 630 So.2d 452 (Ala.Civ.App.1992); Carter v. Griffin, 574 So.2d 800 (Ala.Civ.App.1990); Petersen v. State Dep’t of Human Res., 550 So.2d 1032 (Ala.Civ.App.1989); Valero v. State Dep’t of Human Res., 511 So.2d 200 (Ala.Civ.App.1987); *819 Rose v. Spencer, 491 So.2d 257 (Ala.Civ.App.1986); and In re Gunn, 467 So.2d 963 (Ala.Civ.App.1985)). Although the majority of the court in J.L. rejected Presiding Judge Crawley’s point that past imprisonment is generally irrelevant in a termination-of-parental-rights case, 961 So.2d at 849 n. 3, there has never been a dispute in our cases that current imprisonment extending for a long period during the child’s minority may be a sufficient basis for a finding that the imprisoned parent is unable or unwilling to discharge his or her responsibilities to and for the child, especially when the evidence shows that the imprisonment prevents the parent from performing ordinary parental duties.
In this case, it is undisputed that the father is imprisoned based on his conviction for murder and that he is serving a life sentence. According to the evidence, that imprisonment will last at least another 10 years, during which the children will age from 6 and 4 years old to 16 and 14 years old, respectively. The father anticipates he will be eligible for work release and weekend passes within two to seven years after the date of the termination hearing, but he will still remain imprisoned.[3] According to his testimony, the father is able to visit with the children only twice a month for five hours at a time. As C.P. testified, the imprisonment of the father prevents him from performing the everyday functions of a normal parent— waking and bathing the children, feeding the children, taking the children to school, participating in the children’s extracurricular activities, helping the children with homework, taking the children to church, playing with and nurturing the children, and tucking the children in at night. See K.W.J. v. J.W.B., 933 So.2d 1075, 1081 (Ala.Civ.App.2005) (Murdock, J., dissenting), rev’d, Ex parte 933 So.2d 1081 (Ala.2005). Based on J.L., we conclude that the juvenile court did not err in finding grounds for terminating the father’s parental rights based on his conviction for murder and his imprisonment.
Because we conclude that the circumstances of the father’s imprisonment constitute sufficient grounds for termination, we need not address whether the juvenile court erred in terminating the father’s parental rights based on its other findings that the father had abandoned the children and that the father had failed to support the children for six months preceding the filing of the petition.

Best Interests

The father lastly argues that the termination of his parental rights is not in the best interests of the children.
“Section 26-18-2[, Ala.Code 1975,] of the [Child Protection Act (‘CPA’), § 26-18-1 et seq., Ala.Code 1975,] provides that the guidelines established by the CPA are to be ‘used ... in such a manner as to protect the 'welfare of children by providing stability and continuity in their lives .... ’ (Emphasis added.) This expressed legislative policy of protecting ‘the welfare of children’ in cases involving the termination of parental rights mirrors a long-standing judicial policy of considering the child’s best interest in such cases.”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1191 (Ala.Civ.App.2007). Therefore, “ ‘[pjaramount in a determination regarding the termination of parental rights is a consideration of the child’s best *820 interest.’ ” J.C., 986 So.2d at 1193 (quoting T.S. v. J.P., 674 So.2d 535, 537 (Ala.Civ.App.1995)) (emphasis omitted).
Alabama law indulges a presumption that parental custody is in the best interests of the child. Borsdorf v. Mills, 49 Ala.App. 658, 661, 275 So.2d 338, 340 (1973). However, that presumption may be overcome by clear and convincing evidence indicating that the parent is unfit to care for the child so that it would be against the best interests of the child to remain with the parent. See Ex parte Terry, 494 So.2d 628, 632 (Ala.1986). In this case, the father concedes that he cannot have custody of the children while he is incarcerated. By that concession, the father basically admits that it is not in the best interests of the children for him to maintain any rights to their custody.
The father nevertheless argues that it is not in the children’s best interests to terminate his parental rights because of the speculative nature of D.P. and C.P.’s adoption plans. C.P. testified that she and D.P. intended to adopt the children once the father’s parental rights were terminated. The fact that she did not know under which state law they would proceed does not undermine in any way the certainty of her testimony. It is clear from the reeoi*d that D.P. and C.P. will attempt to adopt the children once the judgment terminating the father’s parental rights is final.
The father also asserts that neither Florida nor Alabama has investigated D.P. and C.P. or approved them for adoption. Presumably, the father contends that, until they have been approved by an appropriate state agency to adopt the children, it would not be in the best interests of the children to terminate his parental rights. The father fails to cite any legal authority to support that position, so we need not consider that argument. See Rule 28(a)(10), Ala. R.App. P. Nevertheless, we point out that the father overlooks the fact that this court has affirmed judgments too numerous to mention based on evidence indicating that there was only a plan to place the children for adoption, without identifying any particular adoptive parent. The fact that D.P. and C.P. have not yet been approved for adoption did not prevent the juvenile court from finding that it was in the best interests of the children to terminate the father’s parental rights.
We also point out that D.P. and C.P. have been the de facto custodians of the children since February 7, 2006, with the approval of the father’s relatives. Moreover, the juvenile court awarded legal custody to D.P. and C.P., and they have been exercising that custody since April 4, 2007. The father did not appeal that custody judgment, which presumably was based on a prior finding that placing custody with D.P. and C.P. was in their best interests. See § 12-15-71(a)(3)c., Ala.Code 1975. From all the evidence in the record, D.P. and C.P. have met all the needs of the children, and the children have thrived under their care.
The father next argues that it would better serve the interests of the children if D.P. and C.P. merely continued acting as their legal custodians without terminating his parental rights. However, one of the overarching purposes of the law allowing juvenile courts to terminate parental rights is to provide stability and continuity for the child. See § 26-18-2, Ala.Code 1975. To that end, the appellate courts generally hold that maintaining an indefinite custody arrangement with a third party is not in the best interests of the child. See, e.g., R.L.B. v. Morgan County Dep’t of Human Res., 805 So.2d 721, 725 (Ala.Civ.App.2001). The father has not cited any evidence in the record that would support a deviation from the general rule in this case.
*821 On the other hand, the evidence shows that, at best, the father will not be in a position to reunite with the children until their adolescence. The children’s present interests in stability and permanency would not be promoted by continuing the current custody arrangement until that time. Moreover, it appears that the father is arguing that he would resume custody of the children upon his release from prison. If so, without a termination of his parental rights, the children will be subjected to a future custody modification or, more likely, a custody dispute, which also is not in keeping with the purpose of the termination-of-parental-rights statute. Therefore, we find that termination of the father’s parental rights was in the best interests of the children.
For the foregoing reasons, we affirm the judgment of the juvenile court.
AFFIRMED.
PITTMAN and BRYAN, JJ., concur.
THOMPSON, P.J., and THOMAS, J., concur in the result, without writings.

. The record does not contain a copy of that judgment.

. Pursuant to Rule 4(a)(4), Ala. R.App. P., ‘‘[a] notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after the entry and on the day thereof.” Thus, the father's March 27, 2008, notices of appeal “quickened” on May 27, 2008, the date of the entry of the judgments.

. The father acknowledged that his estimates were contingent upon the actions of the parole board. For that reason, we agree with D.P. and C.P. that the father's testimony on this point is speculative; however, for the sake of argument, we assume that the father will be released from prison at some point, in line with his testimony.