Rel: October 17, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

## CL-2025-0065

_____

## R.D.

### v.

## Mobile County Department of Human Resources

## Appeal from Mobile Juvenile Court
## (JU-23-832.02)

MOORE, Presiding Judge.

R.D. ("the father") appeals from a judgment of the Mobile Juvenile Court ("the juvenile court") that terminated his parental rights to L.D. ("the child"). In the same judgment, the juvenile court also terminated

the parental rights of A.W. ("the mother"). The mother has not appealed. We affirm the juvenile court's judgment.

In its final judgment, the juvenile court found that the mother threatened the physical and emotional safety of the child because she "suffers from a mental illness of a duration or nature as to render her unable to care for the needs of [the child] now and in the foreseeable future." See Ala. Code 1975, § 12-15-319(a)(2) (requiring a juvenile court, when determining whether to terminate parental rights, to consider an "[e]motional illness, mental illness, or mental deficiency of the parent ... of a duration or nature as to render the parent unable to care for the needs of the child"). The juvenile court further found that the father was "unable to discharge his parental responsibilities for the child and [that] said conduct [was] unlikely to change in the foreseeable future" because, among other reasons,

> "[t]he father appears to be emotionally dependent on the mother. The father is unable or unwilling to protect the child from the mother. He and the mother have lived together in a rental house in Shelby, Alabama for at least one year. He fails to see anything wrong with the mother. He and the mother plan to marry."

The predominant issue in this case is whether the juvenile court's finding that the father lacked protective capacity is supported by sufficient evidence.[1]

Because the judgment was based in part on ore tenus evidence, we presume that the juvenile court correctly found that the father lacked the ability or willingness to protect the child from the mother. We are bound by the findings of the juvenile court if the record contains substantial evidence from which the juvenile court reasonably could have been clearly convinced of the facts contained in those findings. See C.C. v. L.J., 176 So. 3d 208, 211 (Ala. Civ. App. 2015). A juvenile court may be clearly convinced from

> "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."'"

---

[1]The father does not argue that the juvenile court failed to exhaust viable alternatives to the termination of his parental rights or that the termination of his parental rights was not in the best interests of the child, so those arguments are waived. See J.K. v. Jefferson Cnty. Dep't of Hum. Res., 114 So. 3d 835, 842 n.7 (Ala. Civ. App. 2012).

J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1184 (Ala. Civ. App. 2007) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).  On appeal, this court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing.  See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007).

The evidence before the juvenile court showed that the mother has four children.  The mother had lost custody of her three older children before the child was born.  When her oldest child was an infant, the mother said in a social-media post that she had exposed that child to marijuana to help that child sleep.  After family friends took custody of her oldest child, the mother had two other children ("the middle children").  The mother has been investigated by child-protection agencies in Tennessee, Mississippi, and Montana regarding her alleged abusive treatment of the middle children, and she threatened to kill the middle children rather than allow them to be vaccinated.  In 2021, the Mobile County Department of Human Resources ("DHR"), upon learning of that threat and discovering the middle children living in poor

4

conditions with no running water, removed the middle children from the mother's custody. DHR made an "indicated" finding that the mother had committed child abuse and neglect regarding the middle children.[2]

DHR referred the mother to Dr. Jack Carney for a psychological evaluation. The mother informed Dr. Carney that she had sometimes resided with one of her children in an automobile or a hotel. After conducting a battery of psychological tests, Dr. Carney concluded that the mother was emotionally unstable and prone to poor parenting behavior that would place the middle children at risk of physical and emotional abuse and neglect while depriving them of a secure and stable environment. Dr. Carney, who considered the mother to be a "child physical abuse perpetrator, child psychological abuse perpetrator, [and] child neglect perpetrator," diagnosed the mother with cyclothymia, a form of bipolar disorder characterized by impulsivity and random, brief mood swings, and antisocial personality disorder with narcissistic features. Dr. Carney opined that the mother represented a danger to the middle children because she could not control her anger and aggression,

---

[2]An "indicated" finding is made "[w]hen credible evidence and professional judgment substantiates that an alleged perpetrator is responsible for child abuse or neglect." Ala. Code 1975, § 26-14-8(a)(1).

despite her having completed an anger-management program, and because her personality disorder would likely persist in the foreseeable future.

The mother began a romantic relationship with the father at some point in 2022. The child was born on April 18, 2023. Eric Hadley, the DHR social worker assigned to the child's case, testified that, on June 1, 2023, DHR removed the child from the mother's custody and placed the child into the same foster home in which the middle children had been placed because, Hadley said, the mother was not progressing with rehabilitation efforts regarding the middle children. Although the child was removed from the mother's custody, DHR arranged for the mother to visit the child and the middle children and to attend their medical appointments. Hadley testified that, when attending medical appointments, the mother had acted aggressively and that, on one occasion, she had acted so aggressively that he had filed a police report against her. He said that, on another occasion, she had endangered the child by attempting to snatch the child from Hadley while the child was in a car seat, which had resulted in the medical staff contacting law-enforcement officials, who, he said, had appeared and calmed the mother

down. According to Hadley, DHR obtained a court order prohibiting the mother from further attending the child's and the middle children's medical appointments.

The mother also regularly disrupted the individualized-service-plan ("ISP") meetings designed to craft the case plan regarding the child. Hadley testified that the mother had attended an ISP meeting by telephone on April 27, 2023, and that she had been argumentative and combative during that meeting. According to Hadley, although DHR does not allow an ISP meeting to be recorded, the mother had attempted to record the meeting, and the meeting had to be cut short as a result of that attempt and the mother's behavior. On September 13, 2023, the mother personally attended another ISP meeting at which she exhibited aggressive and threatening conduct that resulted in security guards escorting her from the meeting before it ended. On December 6, 2023, the mother refused to attend an ISP meeting unless it was moved from the courthouse to a public library; the mother raised her voice and became very confrontational, causing court police to intervene. Additionally, on January 3, 2024, the mother was arrested for disorderly conduct at the courthouse, and she later pleaded guilty to that charge.

At trial, the mother testified that she had developed her own personal religion that guided her moral decisions and her rearing of the child and the middle children. The mother stated that DHR had no legitimate reason to be involved with her family. The mother believed that DHR had kidnapped her children and that DHR and the other state child-protection agencies who had investigated the family were involved in a large-scale conspiracy to traffic children. The mother maintained an unfounded belief that her children had been subjected to sexual abuse while staying in the foster-care system. The mother became excited during her testimony and had to be told to calm down by the bailiff. After completing her testimony, the mother bolted down the hallway screaming that she was being abused. Dr. Carney testified that the mother's courtroom behavior was consistent with his diagnoses.

From the foregoing evidence, the juvenile court was clearly convinced that, because of her emotional and mental-health issues, the mother could not safely parent the child. Notably, the mother did not appeal the judgment terminating her parental rights to the child. Accordingly, the juvenile court's finding that the mother is dangerously unfit to raise the child because of her mental illness has become the law

of the case.  See generally S.B. v. Lauderdale Cnty. Dep't of Hum. Res., 142 So. 3d 716, 720 (Ala. Civ. App. 2013).  The question for our review is whether the juvenile court received sufficient evidence indicating that the father could not or would not protect the child from the mother to justify terminating his parental rights.

The juvenile court heard evidence indicating that the father has another child, who was born in 2018 ("the older child").  The father testified that he had agreed to relinquish custody of the older child to a maternal relative after the mother of the older child "got into legal trouble" and the house in which they were residing was determined to be unsuitable for the older child.  The father stated that he had intended the surrender of custody of the older child to be temporary "until we could get on our feet," but, he said, the maternal relative ended up adopting the older child.  The father admitted that he never attempted to regain custody of the older child and that he had accumulated a child-support arrearage of $11,545 relating to the older child.  The father had not voluntarily paid any part of that arrearage.  At the time of the termination-of-parental-rights trial, the father owed $2,803.14 in

9

interest in addition to the principal balance of his child-support arrearage.

When the child was born in April 2023, the mother was under DHR supervision relating to the cases involving the middle children. The mother testified that, before the child was born, she and the father had discussed what their living situation would be and that they had agreed that the child would stay with the father most of the time but that they would raise the child together as a family. Hadley testified that he had sent letters to all the local hospitals asking that, if the mother gave birth at the hospital, DHR be notified so that it could retrieve the child; however, unbeknownst to DHR, the mother gave birth to the child at a hospital in Sylacauga. The mother did not inform DHR of the birth of the child. After the Sylacauga hospital discharged the child, the father assumed custody of the child and began raising the child in his mother's house in Alexander City while the mother resided in Wilmer. However, at some point, <u>the father allowed the mother to take the child to her house in Wilmer</u>. DHR found the child there when the mother was being evicted from her house, and deputies informed DHR that the child was in her custody.

The father attended the June 15, 2023, ISP meeting, which was terminated early because of the mother's misconduct, by telephone. During that ISP meeting, DHR informed the father that it wanted to conduct a home study to determine if the child could be safely placed with the father in Alexander City. The father agreed to a home study being conducted on September 8, 2023, but he canceled the home study only 15 minutes before it was scheduled to take place. The father personally attended the September 13, 2023, ISP meeting, during which DHR repeated its request for a home study of the father's home, but the father refused to sign a document memorializing that plan, indicating that he did not agree with the plan. The father witnessed the mother's behavior at that ISP meeting, and he joined the mother when she was escorted out by security guards. Hadley testified that, despite numerous requests, the father had refused to reschedule the home study.

In October 2023, the mother and the father cosigned a lease of a mobile home in Shelby, and they moved in together; they did not, however, inform DHR of that development. The mother said that she had not wanted her new landlord to be harassed. Neither the mother nor the father informed DHR of the address of their shared residence until the

11

termination-of-parental-rights trial in October 2024. The father testified that he shared the mother's concern that some child-protection agencies were kidnapping and trafficking children, and he agreed with her that they should not disclose the address of their residence to avoid harassment.

On December 6, 2023, the father left with the mother when courthouse security was called to respond to the mother's disruptive behavior, and he did not attend the ISP meeting scheduled for that day. DHR proceeded with the ISP meeting scheduled for that day, and DHR developed a new plan calling for the father to submit to a psychological evaluation and drug testing. The mother testified that she had advised the father of his "rights" to refuse drug testing because the child had not been removed from his custody because of substance abuse. The mother testified that DHR could not require the father to submit to evaluation or testing because DHR had not made any allegations against him leading to the removal of the child. The father did not agree to the psychological evaluation. The juvenile court later ordered the father to undergo drug testing, but the father did not comply with that court

order.[3]   The father also failed to comply with a juvenile-court order requiring him to undergo genetic testing.   The father did not communicate with DHR for a long period after December 2023.   The father visited with the child consistently, but he did not attend any of the child's medical appointments.

Despite the evidence to the contrary, the father denied having witnessed any incidents raising concerns regarding the mental health of the mother.  After hearing how the mother lost custody of her oldest child and the middle children and listening to Dr. Carney describe her poor parenting history and prospects, the father testified that he believed that the mother was fit to parent the child and that she was "a very good mother."  He testified that he planned to marry the mother.  The father and the mother lived together, shared their finances and a motor vehicle, jointly visited the child, and were employed by the same employer.  The mother said that, if the child was returned to their custody, she and the

---

[3]The father testified that he had attempted to undergo drug testing on one occasion, but, he said, the door to the drug-testing facility had been locked, and he had been unable to gain entry.  The father did eventually obtain a drug test on his own initiative that produced negative results.

father planned to take turns caring for the child. Hadley testified that, when one parent is significantly troubled, the other parent may be able to protect the child when the parents live apart, but not when they are living "together under one roof."

The foregoing evidence was sufficient to establish that the father had a poor parenting history that suggested that he would not properly support the child and that he would cede the care of the child to others. See G.L. v. State Dep't of Hum. Res., 646 So. 2d 81, 84 (Ala. Civ. App. 1994) ("It was not error for the trial court to consider the mother's previous loss of custody of other children. ... Such evidence may be properly admitted to show the mother's general inability to care for her children and her lack of ability to progress in learning parenting skills."); W.W. v. Clay Cnty. Dep't of Hum. Res., 656 So. 2d 870, 872 (Ala. Civ. App. 1995) ("In determining whether to terminate parental rights, the juvenile court can consider the fact that the parent has lost custody of her other children."); Hayes v. State Dep't of Hum. Res., 563 So. 2d 1035, 1036 (Ala. Civ. App. 1990) ("A party's success in raising other children is also a factor for the trial court's consideration."). Additionally, the juvenile court received sufficient evidence to determine that the father

14

disbelieved any criticism of the mother and her parenting ability, that he had allowed her unsupervised access to the child when the child was an infant, and that he would continue giving the mother such access to the child if his parental rights were not terminated. Although the father testified that he was generally capable of protecting the child, the juvenile court inferred that the father would not protect the child from the mother because, as the juvenile court put it, "[h]e fails to see anything wrong with the mother." Sufficient evidence shows that the father clearly did not perceive the mother to be a threat to the child.

In B.M. v. State, 895 So. 2d 319 (Ala. Civ. App. 2004), this court considered whether a juvenile court had properly terminated the parental rights of a father who refused to believe that his wife had Munchausen's syndrome by proxy ("MBP") and had perpetrated "MBP abuse" upon one of their children. In affirming the judgment, this court relied on expert testimony indicating that a faultless coparent who fails to acknowledge the MBP abuse of the perpetrating parent likely cannot protect the child from the perpetrator. 895 So. 2d at 334. This court said, in pertinent part:

> "In light of the trial court's determination that the mother was the perpetrator of MBP abuse and the father's admitted

15

disbelief of this fact, the trial court had ample evidence to support its determination that the father was 'unable or unwilling to discharge [his] responsibilities to and for the child[ren] ... and that such conduct or condition [was] unlikely to change in the foreseeable future' because of the father's inability to protect the children from future MBP abuse at the hands of the mother."

Id. B.M. illustrates that the parental rights of a parent may be terminated if clear and convincing evidence shows that the parent displays a lack of protective capacity by refusing to believe that the coparent presents a danger to the child. See also J.B.B. v. Alabama Dep't of Hum. Res., 120 So. 3d 517, 531 (Ala. Civ. App. 2013) ("A fortiori, because the mother refused to believe that the father had abused the children, she was unable to protect the children from the abuse."); C.W. v. State Dep't of Hum. Res., 826 So. 2d 171, 173 (Ala. Civ. App. 2002).

By contrast, in L.M. v. Shelby County Department of Human Resources, 86 So. 3d 377 (Ala. Civ. App. 2011), this court reversed a judgment terminating the parental rights of a father because he would not sever his relationship with an alcoholic and drug-addicted mother. This court determined that the "judgment terminating the father's parental rights can be affirmed if clear and convincing evidence shows that the father was unable to protect the children from the danger

16

presented by the mother's alleged inability to remain alcohol and drug free." 86 So. 3d at 388. This court noted that the record contained no evidence indicating that the father had ever failed to protect his children from the mother when she was under the influence of drugs or alcohol and that the father had testified "that he recognized the danger presented to the children if the mother continued to abuse alcohol" and had stated that "he was willing to sever his relationship with the mother if the mother continued on a path of substance abuse." Id. (emphasis added). This court concluded in L.M. that there were no grounds for terminating the parental rights of the father, and we reversed the judgment terminating his parental rights. We further held that, because the father could adequately supervise the children and protect them from any risk of harm arising from the mother's substance-abuse issues, the children could be safely placed back into the family home, and we reversed the judgment terminating the mother's parental rights.

Although it is not a case in which the rights of a parent were terminated, C.S. v. Morgan County Department of Human Resources, 412 So. 3d 651 (Ala. Civ. App.), cert. quashed sub nom. Ex parte J.R., 412 So. 3d 673 (Ala. 2024), also addressed a situation in which an otherwise

17

faultless parent was accused by the state of failing to adequately protect a child from a coparent. In that case, the mother experienced a severe mental-health breakdown that endangered the child, leading to the dependency of her child. When the father learned of his paternity of the child and of the plight of the child, he urgently sought to obtain custody of the child; however, the Morgan County Department of Human Resources and the child's guardian ad litem expressed concern that the father would allow the mother unsupervised access to the child because he did not seem to comprehend the nature and depth of the mother's mental-health problem and because he intended to pursue a romantic relationship with the mother. The record showed that the father and the mother did not live together; that the father understood that the erratic behavior of the mother could endanger the child; and that the father acknowledged that, until the mother was rehabilitated, her visitation with the child should be supervised. The record also showed that the father possessed normal parental instincts that would lead him to protect the child from the mother. Because the record in that case contained no evidence indicating that the father was unable or unwilling to recognize that the mother could harm the child and would not take necessary

18

protective measures toward the child, this court determined that the father did not lack protective capacity, and, thus, we held that the child was not dependent as to him.

We agree with the Supreme Court of South Dakota that "where one parent's rights are properly terminated, the other parent's parental rights could also be terminated where the parents live together and returning a child to [one] parent would not protect the child from neglect or abuse by the [other] parent." In re J.W.W., 334 N.W.2d 513, 517 (S.D. 1983). In this case, like in B.M. and unlike in L.M. and C.S., clear and convincing evidence showed that the father intended to continue living with the mother and that he was unable or unwilling to recognize the danger that the mother presented to the child, the most basic element of protective capacity.[4]

Section 12-15-319(a) provides, in pertinent part, that, "[i]f the juvenile court finds from clear and convincing evidence, competent,

---

[4]The dissent argues that the failure of DHR to promptly notify the father that it considered his relationship with the mother to be a barrier to reunification supports a reversal of the judgment; however, the father did not argue this specific point in the proceedings below or in his brief to this court, so we cannot consider it. See T.J. v. Winston Cnty. Dep't of Hum. Res., 233 So. 3d 361, 367 (Ala. Civ. App. 2007).

19

material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, ... it may terminate the parental rights of the parent[]." One of the basic responsibilities a parent owes a child is to protect the child, see D.H.E. v. W.D., 330 So. 3d 506, 516 (Ala. Civ. App. 2020), especially from the threat of emotional or physical abuse from the other parent. See B.M., supra. The juvenile court received sufficient evidence to be clearly convinced that the father had already put the child in harm's way by allowing the mother to have unsupervised custody of the child when the child was only weeks old and that, because he did not consider the mother a safety threat to the child, he would not protect the child from the risk of neglect or abuse by the mother, whose parental rights had been terminated. Therefore, we conclude that the juvenile court had sufficient grounds to terminate the father's parental rights.[5]

_____

[5]The father argues that the juvenile court erred in relying on other factors in determining grounds for termination; based on our disposition, we pretermit any discussion of those other factors. See K.A.P. v. D.P., 11 So. 3d 812, 819 (Ala. Civ. App. 2008) (holding that judgment terminating parental rights was sufficiently supported by evidence associated with imprisonment of parent, obviating any need to consider abandonment and other factors); cf. J.M. v. Marshall Cnty. Dep't of Hum. Res., 399 So. 3d 280 (Ala. Civ. App. 2024) (reversing judgment terminating parental rights when determining that primary factors upon which juvenile court

For the foregoing reasons, we affirm the judgment of the juvenile court terminating the parental rights of the father.

AFFIRMED.

Edwards, Hanson, and Fridy, JJ., concur.

Bowden, J., dissents, with opinion.

had relied were not proven by clear and convincing evidence and that error in relying on those factors was not harmless because this court could not discern whether juvenile court would have reached the same conclusion absent those unproven factors).

BOWDEN, Judge, dissenting.

I respectfully dissent.

The termination of parental rights is the severance of all rights of a parent to a child. § 12-15-301(18), Ala. Code 1975. It is a "'"drastic measure,"'" Ex parte T.V., 971 So. 2d 1, 10 (Ala. 2007), and a "permanent form of governmental interference with parental rights." M.P. v. DeKalb Cnty. Dep't of Hum. Res., 394 So. 3d 1080, 1086 (Ala. Civ. App. 2023). Other state courts have characterized the termination of parental rights as the "'civil death penalty.'" M.E. v. Shelby Cnty. Dep't of Hum. Res., 972 So. 2d 89, 102 (Ala. Civ. App. 2007)(citing cases from Nevada, Missouri, and North Carolina). Alabama recognizes that parents have a fundamental right to control the education, upbringing, care, and supervision of their children, see § 26-1-6(a)(1), Ala. Code 1975, and reserves the termination of parental rights only for the most egregious cases.

To that end, the people of Alabama require the state, before it enacts the "civil death penalty," to rebut -- with clear and convincing evidence -- the well-settled presumption that a parent has "protective capacity"; in other words, we presume that a parent can and will protect

22

his or her child from harm until the state proves otherwise. <u>C.S. v. Morgan Cnty. Dep't of Hum. Res.</u>, 412 So. 3d 651, 662 (Ala. Civ. App. 2024)("It is well settled that Alabama law presumes that a parent possesses all the natural instincts needed to properly raise his or her child, which presumption may be overcome only by clear and convincing evidence to the contrary.").

> "So strong is [the presumption that a parent's right to custody is in the best interest of a child] … that it can be overcome only by a finding, <u>supported by competent evidence</u>, that <u>the parent seeking custody</u> is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question."

<u>Ex parte Mathews</u>, 428 So. 2d 58, 59 (Ala. 1983)(emphasis added).

What was the strongest evidence offered by the state to rebut the presumption that R.D. ("the father") will protect his child?

(1) Testimony that A.W. ("the mother") is a safety risk to L.D. ("the child")

(2) Testimony that the father believes that the mother is a good mother.

(3) Testimony that the father remained in a relationship with the mother at the time of trial.

Under our caselaw, that evidence is simply not sufficient to overcome the strong and well-settled presumption that the father can and will protect the child from harm.

No witness testified that the father could not protect the child from the mother, if the mother was not living in his home, and no witness testified that the father would not protect the child from the specific safety risk posed by the mother's psychiatric condition, if the mother was living in his home. Cf. L.M. v. Shelby Cnty. Dep't of Hum. Res., 86 So. 3d 377, 388 (Ala. Civ. App. 2011). No witness testified that the father would or might give the mother access to the child if the mother's parental rights were terminated. See C.S., supra.[6] And no witness testified that the father had remained in a relationship with the mother over the state's request that he end his relationship with the mother. See C.W. v. State Dep't of Hum. Res., 826 So. 2d 171 (Ala. Civ. App. 2002). In fairness, the

---

[6]The majority opinion emphasizes what the mother planned to do if the child was returned to her custody. It is unclear to me how the mother's testimony about what she planned to do, in the event that the child was returned to her custody (which it will not be), supports any inference about what the father might do now that the mother's parental rights have been terminated. It remains that no witness has testified about what the father might do now that the mother's parental rights have been terminated.

state could not present such testimony, because the state did not identify the father's relationship with the mother as a barrier to reconciliation before it commenced an action to terminate the father's parental rights.

If the state failed to even identify the relationship with mother as a barrier to reconciliation, then evidence of the father's continuing in that relationship is clearly not sufficient to overcome the strong and well-settled presumption that the father can and will protect his child from harm.[7]

---

[7]The state's failure to inform the father, before commencing its action to terminate the father's parental rights, that his relationship with the mother was a danger to the child is indicative of the overall insufficiency of the evidence to support the termination of the father's parental rights, an issue that was preserved and adequately argued on appeal.

If the state considered the father's relationship with the mother to be so dangerous and, indeed, a reason for terminating the father's parental rights, why did the state wait until "January 2024," i.e., until the discovery phase of the trial, which followed three individualized service plans and the filing of the termination-of-parental-rights petition, to raise that relationship as an issue?

Even then, in January 2024, the state still did not identify the father's relationship with the mother as a problem because of the mother's being perceived as a safety risk to the child. In its discovery responses, the state said only the following with respect to the father's relationship with the mother: "Termination of parental rights is necessary due to the father's lack of cooperation with the [state]. ... The father remains in a relationship with the mother and may be living with

In lieu of relying on evidence to overcome the presumption that the father possesses protective capacity, the majority opinion appears to rely on inferences upon inferences to support the judgment of the Mobile Juvenile Court ("the juvenile court"), even relying on factors that are not relevant to the issue of the father's protective capacity.[8] We must resist

_____

her, and she also will not cooperate with the [state]." Stating that the "father remains in a relationship with the mother" and pointing out that she will not cooperate with the state is clearly different than informing the father that he must separate from the mother because she is a safety risk to the child. Thus, the state's discovery response clearly does not demonstrate that the state had informed the father that it considered the mother to be a safety risk to the child before the trial to terminate his parental rights commenced.

Finally, when asked at trial if the father's relationship with the mother was "an extremely significant concern," the representative for the state responded only "[p]ossibly."

[8]For instance, the majority opinion states that there was sufficient evidence "to establish that the father had a poor parenting history" because the father had voluntarily ceded custody of an older child and had failed to pay child support for that child. ___ So. 3d at ___. However, the father's voluntarily ceding custody of and failing to financially support another child are not relevant to whether the father is unable or unwilling to protect the child from harm by the mother. And the cases cited by the majority opinion, which pertain to parents who involuntarily lost custody of their children, do not show that a parent's voluntarily ceding custody bears on a parent's protective capacity either.

"There is nothing wrong with a case built around sufficient circumstantial evidence, <u>provided the circumstances are proved and not merely presumed.</u>" <u>Folmar v. Montgomery Fair Co.</u>, 293 Ala. 686, 690,

the inclination to rely on speculation to affirm a judgment that terminates a parent's fundamental right to his or her child. And we set a concerning precedent by doing so in this case.

I.  <u>The cases relied upon in the majority opinion are clearly distinguishable.</u>

The main case relied upon in the majority opinion, <u>B.M. v. State</u>, 895 So. 2d 319 (Ala. Civ. App. 2004), is wholly distinguishable from this case. <u>B.M.</u> concerned a parent's inability to recognize <u>past abuse</u>, and, in <u>B.M.</u>, the state produced two expert witnesses <u>who testified</u> about the <u>effect</u> that the inability to recognize past abuse would have on the ability of a father, M.F., to protect his child in the future.  At trial, two experts testified that B.M., M.F.'s wife, had Munchausen's syndrome by proxy ("MBP") and was perpetrating "MBP abuse" on their oldest child. In affirming the Montgomery Juvenile Court's judgment terminating M.F.'s parental rights, this court noted that the two experts' testimony was

---

309 So. 2d 818, 821 (1975)(emphasis added). "There is conjecture only where there are two or more <u>plausible explanations</u> of causation, and the evidence does not logically point to one any more than the other." <u>Id.</u> (emphasis added).

"unequivocal" that a person who does not believe that MBP abuse has occurred cannot protect a child from the perpetrator and that M.F. did not believe that B.M. had abused the couple's oldest child. Accordingly, this court held that the Montgomery Juvenile Court had ample evidence to support its determination that M.F. was "unable or unwilling" to discharge his responsibilities, which is required to terminate parental rights, under § 12-15-319.

This case is wholly unlike B.M. The mother in B.M. had perpetrated abuse on the child, and the father in B.M. had refused to believe that the abuse had occurred. In this case, the state presented no evidence indicating that the mother had abused the child or that the father had failed to recognize abuse of the child by the mother. In fact, the child had been summarily removed from the father's and the mother's custody. Thus, "[t]he father never had an occasion to respond to any safety threat the mother posed to the child and, consequently, never failed to protect the child from the mother." C.S., 412 So. 3d at 662. This case further differs from B.M. because, in B.M., the state provided clear and convincing evidence -- in the form of expert testimony -- about how M.F.'s beliefs about B.M.'s condition and past abuse of the child rendered him

28

unable to care for or protect the child. In this case, the state presented testimony that the father believes that the mother is a "good mother." There is no testimony that such a belief renders him incapable of protecting his own child from the mother, which we must presume that he is able to do.

An examination of our other protective-capacity cases similarly exposes the dearth of evidence in this case with respect to the father's alleged lack of protective capacity. The majority opinion relies on J.B.B. v. Alabama Department of Human Resources, 120 So. 3d 517, 531 (Ala. Civ. App. 2013). But J.B.B., like B.M., concerns evidence of a parent's inability to recognize past abuse. In that case, we held that because J.B.B. refused to believe that J.W.B. had abused the parties' children, "[a] fortiori" J.B.B. was unable to protect the parties' children from future abuse.

In its brief, the state cites J.W.M. v. Cleburne County Department of Human Resources, 980 So. 2d 432, 436 (Aa. Civ. App. 2007), which involved a father who was deemed "codependent." But the similarities between this case and J.W.M. end there. In J.W.M., the Cleburne County Department of Human Resources ("the Cleburne County DHR") provided

29

expert and lay testimony about the relationship of the father, J.W.M., with the mother, K.P., and how J.W.M.'s codependency would affect his ability to parent their child, J.B. For instance, the Cleburne County DHR elicited extensive testimony about J.W.M.'s protective capacity from a licensed professional counselor who had counseled both J.W.M. and K.P. and had overseen their drug testing.

Unlike in J.W.M., in this case the state did not present expert or lay testimony concerning the effect that the father's codependency would have on his ability to protect the child from abuse. The state did not present evidence, such as testimony or documents, indicating that, like in J.W.M., the father's codependency on the mother so interfered with his ability to protect the child that the state had asked the father to terminate his relationship with the mother, or no longer reside with the mother, or that the juvenile court had ordered any similar action requiring the father's physical or emotional separation from the mother.

The state had not even identified the father's relationship with the mother as "a conduct" or "a condition" rendering him unable to parent the child, until after the commencement of the termination-of-parental-rights action.

"Because there was no evidence of <u>how</u> the [f]ather living with the [m]other would actually prevent him from properly caring for the child, the trial court could not have reached a firm conviction that the [f]ather was so emotionally dependent on the [m]other as to render him unable or unwilling to discharge his responsibilities to and for the child."

The father's reply brief, p. 4-5 (emphasis in original).

 II. <u>The majority opinion appears to conflict with at least one prior decision of this court and our supreme court.</u>

Our state's deference afforded to the fundamental rights of a parent does not allow us to speculate our way into severing a parent's rights to his or her child -- and doing so in this case appears to conflict with cases requiring the state to overcome the presumption of a parent's protective capacity by clear and convincing evidence. <u>C.S.</u>, 412 So. 3d at 662 ("<u>See Griggs v. Barnes</u>, 262 Ala. 357, 359, 78 So. 2d 910, 912 (1955) (holding that evidence of 'a shabby and uncompelling nature' is insufficient to prove that a parent lacks the capacity to properly raise his or her child).").

In <u>C.S.</u>, the Morgan County Department of Human Resources ("the Morgan County DHR") and the foster parents of a child, A.J.S., alleged that A.J.S. was dependent as to his father, J.B., because, they alleged, J.B. lacked "protective capacity." Specifically, <u>witnesses testified</u> that they were concerned <u>that J.B. would not protect A.J.S. from being</u>

harmed by C.S., A.J.S.'s mother. The Morgan Juvenile Court agreed, finding A.J.S. dependent as to J.B. This court noted that the Morgan Juvenile Court, concluding that J.B. lacked protective capacity, had relied almost exclusively on the evidence indicating that J.B. had maintained a relationship with C.S. over the objections of the Morgan County DHR.

On appeal, this court reversed the judgment finding A.J.S. dependent as to J.B. and held that the Morgan County DHR and the foster parents had therefore failed to prove any ground upon which to terminate J.B.'s parental rights. C.S., 412 So. 3d at 668. We reasoned that J.B. had not committed any act or exhibited any behavior indicating that he had or would jeopardize the safety of A.J.S. Id. at 665. We noted that, "[a]t best, [the Morgan County DHR and the foster parents had] presented testimony only speculating that [J.B.] would give [C.S.] unsupervised access to [A.J.S.]." Id. (emphasis added).

> "At trial, [the Morgan County DHR] conceded … that it would have recommended that [J.B.] be awarded custody except for his continuing contacts with [C.S.], which it deemed to jeopardize the safety of [A.J.S.]. … Because the child was never present during any of the contacts between [J.B.] and [C.S.], [A.J.S.] was not endangered in any way by the relationship between [J.B.] and [C.S.], which, in fact, had no proven effect on [A.J.S.]. The mere fact that [J.B.] regularly

32

associated with [C.S.] does not permit an inference that, if given the opportunity, he would expose [A.J.S.] to [C.S.] without proper supervision or allow [C.S.] to interact with [A.J.S.] in a manner that would endanger the health and safety of [A.J.S.]. Indisputably, [J.B.] did not follow [the Morgan County DHR's] no-contact edict, and [J.B.] did not heed [the Morgan County DHR's] warnings that it would oppose his custody claim if he did not disassociate from [C.S.]; however, [J.B.'s] 'violation' of the no-contact directive, which, we note, was never incorporated into any juvenile-court order, does not in any way prove that [J.B.] lacks the ability or willingness to protect [A.J.S.]. Clearly, a parent does not 'forfeit' his or her custodial rights simply by failing to comply with the terms of an [individualized service plan] as requested by [the Morgan County DHR]."

C.S., 412 So. 3d at 664 (emphasis added).

Like in C.S., the majority opinion in this case has identified the "question for our review [as] whether the juvenile court received sufficient evidence indicating that the father could not or would not protect the child from the mother to justify terminating his parental rights."[9] And like in C.S., there is no evidence indicating that the father

---

[9]Although we did not reverse a judgment terminating parental rights in C.S., its holding remains in conflict with the present case because of the relationship between a finding of dependency and the termination of parental rights when the state is involved. In fact, in C.S., we concluded that the Morgan County DHR and the foster parents could not prove any ground to terminate J.B.'s parental rights because we had reversed the judgment finding the child in that case to be dependent as to J.B.

failed to protect the child from abuse by the mother in the past. The state likewise failed to produce evidence -- through testimony or documents -- indicating that the father would jeopardize the safety of the child in the future or indicating that the father's "emotional dependence" on the mother rendered him incapable of protecting his child from abuse by the mother. There is likewise no evidence -- from any witness -- who feared that the father's belief in the mother's sanity or his desire to marry the mother puts the child at risk of abuse by the mother. As the father argues, "[t]hat the [m]other and [f]ather are in a relationship does not prove, per se, that the [f]ather is incapable of protecting the child from the [m]other." The father's brief, p. 48.

In C.S. "[the Morgan County DHR and the foster parents] presented testimony only speculating that [J.B.] would give [C.S.] unsupervised access to [A.J.S.]." 412 SO. 2d at 665. We have even less evidence here. Not a single witness testified that the father would give the mother unsupervised access to the child. And unlike in C.S., in which J.B. violated a no-contact order, the state failed to even request that the father separate from the mother. The direct and circumstantial evidence of the father's lack of protective capacity that the state produced at trial

is of a "shabby," "uncompelling nature," insufficient to overcome our well-settled presumption in favor of the father's protective capacity. See Griggs v. Barnes, 262 Ala. 357, 359, 78 So. 2d 910, 912 (1955) (holding that evidence of "a shabby and uncompelling nature" is insufficient to prove that a parent lacks the capacity to properly raise his or her child)."

    III.   <u>Remand is required because there is no indication that lack of protective capacity is a "primary factor," and no other finding by the juvenile court supports termination.</u>

The majority declines to analyze the remaining arguments of the father. It does not clearly explain why it will not do so, stating, instead, that its decision not to analyze the father's remaining arguments is "based on our disposition" and providing citations to a case involving an imprisoned parent and to J.M. v. Marshall County Department of Human Resources, 399 So. 3d 280 (Ala. Civ. App. 2024). ___ So. 3d at ___ n.5. From what I can infer, it appears that the majority declines to analyze the father's remaining arguments because it considers the father's protective capacity to be a "primary factor" upon which the juvenile court relied to terminate his parental rights. See ___ So. 3d at ___ n.5. (comparing K.A.P. v. D.P., 11 So. 3d 812 (Ala. Civ. App. 2008), and J.M.

and noting that the judgment in <u>J.M.</u> was reversed because the "primary factors upon which juvenile court had relied were not proven by clear and convincing evidence"). But there is no indication in the juvenile court's judgment in this case that the juvenile court believed that the father's lack of protective capacity was more significant than any of the other four factors that it cited when terminating the father's parental rights. In addition to finding that the father had "failed to provide for the material and financial needs of the child since the child has been in care," the juvenile court's judgment states:

> "The father is unable to discharge his parental responsibilities for the child and said conduct is unlikely to change in the foreseeable future as evidenced by the following:

> "i. The father appears to be emotionally dependent on the mother. The father is unable or unwilling to protect the child from the mother. He and the mother have lived together in a rental house in Shelby County, Alabama for at least one year. He fails to see anything wrong with the mother. He and the mother plan to marry. ...

> "ii. The father has only participated minimally in the case plan in order to have his daughter returned to his care. He has had no contact with the social worker outside the mother's presence. Although he attended one [of the three] ISP meeting[s] in person and one by phone he

testified that he could not remember what he has been asked to complete.

"iii. Although court ordered to take a DNA test after a court hearing, the mother and the father refused to participate.

"iv. The father has not tried to adjust his circumstances for the benefit [the child]. The father refused to let the social worker visit the home he occupied with the mother echoing the mother's claim that they were afraid of being harassed if [the state] knew their address."

Nothing in the above text of the judgment suggests that the father's lack of protective capacity was more or less significant than any other factor that the juvenile court relied upon to terminate the father's parental rights. And I can see no statements from the juvenile court expounding on the weight of the factors that it relied upon in rendering its judgment. Because there is no evidence as to which findings -- if any -- are the "primary factors" relied upon by the juvenile court, we should follow J.M. and analyze the father's remaining arguments. This is especially necessary because, after my review, I believe that those arguments have merit. If the court were to analyze the father's arguments and conclude, as I believe, that the factors relied on by the juvenile court lack merit, we would reverse the juvenile court's judgment for it to consider whether it

would still terminate the father's parental rights, despite the father's lack of protective capacity, pursuant to the practice we established in J.M.

Conclusion

We require more than speculation to terminate a parent's fundamental right to raise his or her child, and "'"[t]he fear of harm to the child ... must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution."'" C.S., 412 So. 3d at 665 (quoting T.J. v. Calhoun Cnty. Dep't of Hum. Res., 116 So. 3d 1168, 1175 (Ala. Civ. App. 2013)). The father testified that the mother is a good mother, but where is the evidence -- from lay witnesses or experts -- that such a belief would overcome his natural and presumptive capacity to protect his own child from abuse?

What I am trying to demonstrate in this dissent, stated in the simplest terms possible, is that the father had the rights to his own child permanently severed without a shred of evidence that he had ever harmed the child, put the child in harm's way, or failed to protect the child. Or for that matter there is no evidence that he ever harmed <u>any</u>

38

child. If the state is allowed to take a child from a parent based on the evidence in this case, then we have gone too far.

Accordingly, I respectfully dissent.